[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-11697
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 10, 2011
JOHN LEY
CLERK

D. C. Docket Nos. 08-00442-CV-CB-M, 04-11858

IN RE:  CHARLES L. LETT, SR.,

Debtor.

_____

ALABAMA DEPARTMENT OF ECONOMIC & COMMUNITY
AFFAIRS,

                                                                      Plaintiff-Appellant,

versus

BALL HEALTHCARE-DALLAS, LLC,
REGIONS BANK,

                                                                      Intervenor-Plaintiffs-
                                                                             Appellees,

versus

CHARLES L. LETT, SR.,

                                                                      Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(February 10, 2011)

Before TJOFLAT, CARNES and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

This appeal arises out of an individual Chapter 11 bankruptcy proceeding filed in the Bankruptcy Court for the Southern District of Alabama by Dr. Charles L. Lett, Sr. ("Lett" or "Debtor"). As in the district court on appeal, the State of Alabama, by and through the Alabama Department of Economic and Community Affairs ("ADECA" or "Creditor"), challenges the bankruptcy court's confirmation of Lett's plan of reorganization.

Broadly stated, "Chapter 11 strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 51, 128 S. Ct. 2326, 2339, 171 L. Ed. 2d 203 (2008) (citations omitted). Its focus is on the reorganization of a debtor's obligations rather than the orderly liquidation of a debtor's assets. Corporations as well as

2

individuals may take advantage of the provisions of the chapter. As with all

bankruptcy schemes, Chapter 11[1] envisions that the claims of some creditors will

not be paid in full, and thus provides protections to ensure that those creditors

receiving less than the full value of their claim—"impaired" creditors[2]—are

treated fairly. As such, if a class[3] of impaired creditors votes to reject[4] a proposed

plan of reorganization, a bankruptcy court may only approve the plan if it

conforms with a set of provisions outlined in § 1129(b) of the Bankruptcy Code.

This procedure is known colloquially as a "cram down."[5] In <u>Bank of America

National Trust & Savings Ass'n v. 203 N. LaSalle Street Partnership</u>, the United

---

[1] All statutory references herein are to Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

[2] Strictly speaking, it is the <u>claim</u> of a creditor that is impaired, not the creditor itself. § 1124. For simplicity's sake, we refer to a creditor that is a holder of an impaired claim as an "impaired creditor."

[3] A plan of reorganization places claims against a debtor into groupings known as "classes"; a class may only contain similarly situated claims. § 1122 ("[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."). A creditor may ultimately have more than one claim placed within different classes, as is the case with ADECA's claims here.

[4] In order for a class of impaired creditors to <u>accept</u> a proposed plan, a majority of the creditors and those holding two-thirds of the total dollar amount of the claims within that class must vote to approve the plan. § 1126(c).

[5] If <u>all</u> impaired creditors vote to reject a plan, then the plan cannot be crammed down. <u>See</u> § 1129(a)(10) ("If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must] accept[] the plan . . . .").

States Supreme Court explained this process, including the central function of the

"absolute priority rule" in a cram down:

> There are two conditions for a cramdown. First, all requirements of
> § 1129(a) must be met (save for the plan's acceptance by each
> impaired class of claims or interests, see § 1129(a)(8)). . . . Second,
> the objection of an impaired creditor class may be overridden only if
> "the plan does not discriminate unfairly, and is fair and equitable,
> with respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan." § 1129(b)(1). As to a dissenting
> class of unsecured creditors, such a plan may be found to be "fair and
> equitable" only if the allowed value of the claim is to be paid in full,
> § 1129(b)(2)(B)(i), or, in the alternative, if "the holder of any claim or
> interest that is junior to the claims of such [impaired unsecured] class
> will not receive or retain under the plan on account of such junior
> claim or interest any property," § 1129(b)(2)(B)(ii). That latter
> condition is the core of what is known as the "absolute priority rule.

526 U.S. 434, 441–42, 119 S. Ct. 1411, 1415–16, 143 L. Ed. 2d 607 (1999)

(alteration in original) (emphasis added); see also Norwest Bank Worthington v.

Ahlers, 485 U.S. 197, 202, 108 S. Ct. 963, 966, 99 L. Ed. 2d 169 (1988) ("[T]he

absolute priority rule provides that a dissenting class of unsecured creditors must

be provided for in full before any junior class can receive or retain any property

[under a reorganization] plan." (alteration in original) (citations omitted) (internal

quotation marks omitted)). Thus, the absolute priority rule specifically prevents a

holder of equity interests—whose claim is junior to that of unsecured

creditors—from retaining property interests under the plan unless dissenting impaired unsecured creditor classes are paid in full.[6]

A bankruptcy court has an independent obligation to ensure that a proposed plan complies with this absolute priority rule before "cramming" that plan down upon dissenting creditor classes. By providing a rigid set of obligations for the court in approving a plan in cram down, Chapter 11 serves to prevent both a debtor from unfairly discriminating against a specific creditor or group of creditors, as well as obstinate creditors from holding up the approval of an otherwise sound plan of reorganization. Because even an uncontroversial Chapter 11 plan will normally impact a variety of parties with competing interests, a bankruptcy court necessarily plays an active role in the more contentious cram down of a plan of reorganization.

---

[6] The term "absolute priority rule" does not appear in the Bankruptcy Code, but it is a "creature[] of law antedating the current Bankruptcy Code." Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 444, 119 S. Ct. 1411, 1417, 143 L. Ed. 2d 607 (1999). The rule developed to protect against "the danger inherent in any reorganization plan proposed by a debtor . . . that the plan will simply turn out to be too good a deal for the debtor[]." Id. (citations omitted). "Hence the pre-Code judicial response known as the absolute priority rule, that fairness and equity required that 'the creditors . . . be paid before the stockholders could retain [equity interests] for any purpose whatever.'" Id. (quoting N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508, 33 S. Ct. 554, 561, 57 L. Ed. 931 (1913)).

There is a major exception to the rule, known as the "new value exception," which contemplates the receipt of property by equity holders before full payment of creditors in a debtor's reorganization, provided that those equity holders make a "fresh contribution" to the insolvent enterprise. Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 121, 60 S. Ct. 1, 10, 84 L. Ed. 110 (1939). We decline further discussion of this exception to the absolute priority rule, as it is not at issue in this case.

In the case at hand, ADECA, an impaired creditor in a dissenting class, argues that the plan approved by the bankruptcy court does not comply with the cram down provisions set forth in § 1129, specifically the absolute priority rule. While ADECA raised this issue before the district court, it did not do so before the bankruptcy court.

Squarely before us, then, is whether an impaired creditor in a dissenting class in a cram down proceeding under § 1129 of Chapter 11 may challenge on appeal a bankruptcy court's confirmation of a plan of reorganization on the ground that it violates the absolute priority rule, despite that creditor's failure to formally object on that ground while the proceeding remained in the bankruptcy court. Because of the unique nature of the absolute priority rule and the statutory obligations facing a bankruptcy court in a cram down proceeding, we hold that a creditor may indeed have such a challenge heard in the appellate courts, notwithstanding the generally applicable civil plain error rule.[7] The district court denied ADECA the opportunity to fully present its arguments regarding the absolute priority rule. We therefore vacate the district court's ruling and remand

_____

[7] We use the term "civil plain error rule" to stand for the proposition that an issue not raised at the trial court level by a litigant may not be pressed on appeal absent a showing that a miscarriage of justice will result from the appellate court's refusal to address the issue. See infra part II.B.1.

with instructions to rule on the merits of ADECA's absolute priority rule arguments in a manner consistent with this opinion.

We begin in part I with a brief discussion of the facts and the proceedings below. In part II we address the matter of mootness, and, finding that this controversy is not moot, consider the civil plain error rule and its application to ADECA's substantive arguments on appeal regarding the absolute priority rule.

## I.

## A.

Lett is a practicing physician in Selma, Alabama. As a result of a default on a United States Department of Housing and Urban Development loan, Creditor ADECA held a judgment lien against Lett in an amount in excess of $3 million.[8] Intervenor Ball Healthcare-Dallas, LLC ("Ball") holds a leasehold interest in the largest asset of Lett's estate, a nursing home located in Selma.[9] After Lett filed a voluntary Chapter 11 petition on March 26, 2004, ADECA filed a proof of claim

---

[8] Under Alabama law, ADECA's recorded judgment lien was a lien on any real or personal property owned by Lett, subject to existing liens and encumbrances. Ala. Code § 6-9-211. Lett acknowledged as much in his proposed plan of reorganization: "[ADECA's] claim, being a judgment lien, has priority as it relates to any property not already encumbered."

[9] Ball is not a creditor of Lett and therefore neither assented to nor voted against any of his proposed plans of reorganization. Regions Bank, the holder of a mortgage upon the leasehold interest held by Ball, filed a motion to intervene in the appeal, which the district court granted. Regions Bank did not, however, independently file any briefs in the district court or in this court and, in effect, is not a party in these appellate proceedings.

in the amount of $3,012,060.34 based on its judgment lien. As indicated by Lett in the bankruptcy proceedings, he filed the petition to reorganize and to handle adequately his creditors, particularly ADECA. Because no other creditor is party to this appeal, we focus predominantly on the treatment of ADECA's claims throughout the proceedings in the courts below.

On November 4, 2004, Lett filed his first proposed plan of reorganization, which divided ADECA's claim into secured and unsecured claims.[10] Class 7 contained the secured portion of ADECA's claim. For that class Lett proposed to "pay ADECA a total of $3,500.00 in 2 annual installments of $1,750.00 due on the anniversary date of the confirmation order." The amount of $3,500 was based on the purported value of Lett's unencumbered property, a value ADECA contested throughout the proceedings. The remainder of ADECA's multi-million dollar claim was treated as a general unsecured claim and grouped together with all other such claims in Class 8.[11] ADECA's unsecured claim, the largest in Class 8, was

---

[10] The amount of ADECA's claim exceeded the value of Lett's unencumbered property, and ADECA did not elect for special treatment of its claim under § 1111(b)(2). As such, the secured portion of its claim—the "allowed" amount—was limited to the value of the collateral, while the remaining deficiency was properly treated as an unsecured claim. See §§ 506(a)(1), 1111; see also Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133, 151–52 (1979).

[11] The placement of ADECA's unsecured claim varied from plan to plan; at times it was grouped with all other general unsecured claims against Lett, while at other times it was in a class by itself. The proponent of a plan "has considerable discretion to classify claims and interests according to the facts and circumstances of the case . . . ." In re Holywell Corp., 913 F.2d 873,

scheduled to be paid at one percent in three annual installments, beginning one year from confirmation. On December 21, 2004, the bankruptcy administrator filed a brief objection to the plan, stating that it could not be approved because its schedule of payments "violate[] the absolute priority rule of 11 U.S.C. Sec 1129."

Undeterred, Lett filed an amended plan of reorganization, increasing the secured portion of ADECA's claim to $4,794 based on a revised valuation of the relevant property. Again, the bankruptcy administrator objected on the ground that the amended plan violated the absolute priority rule. There is no indication in the record that the administrator so objected at the request of ADECA, or that ADECA objected to the plan on the specific ground that it violated the absolute priority rule.

Lett filed a second amended plan on October 12, 2007, and, finally, a third amended plan on November 16, 2007—the plan now at issue (the "Plan"). As to the secured portion of ADECA's claim, the Plan placed it in Class 7 and proposed to pay $235,615 in installments of $12,616 beginning roughly five years after confirmation. This increase in ADECA's secured claim was the result of yet

---

880 (11th Cir. 1990). The record indicates that, because ADECA's unsecured claim and the claims of other general unsecured creditors were of equal priority, Lett retained the discretion to place them in the same class or separate classes so long as such classifications were not "designed to manipulate class voting" or to "violate[] basic priority rights." Id. There is no indication of such misbehavior here.

9

another revaluation of Lett's unencumbered property. The Plan then separated ADECA's unsecured claim—the difference between the total owed and the Class 7 secured claim—from all other general unsecured claims and placed it alone in Class 8. Of the greater than $2 million value of ADECA's unsecured claim, the plan would pay roughly $20,000, or one percent, in two annual installments after payment of all secured claims. All other unsecured claims, in Class 9, were scheduled to be paid at one percent of their value in one installment six months after confirmation.[12] Finally, the Plan stated that "[e]xcept as otherwise provided in any provision of this Plan, on the Effective Date all property of the Estate shall

---

[12] Nothing in the record indicates that the Class 9 general unsecured claims should be considered "junior" to ADECA's Class 8 unsecured claim simply because they were placed in a different class. While dissimilar claims may not be placed in the same class in a plan of reorganization, the Bankruptcy Code does not require that similar claims must be placed in the same class. See supra notes 3, 11. As the absolute priority rule concerns the treatment of unsecured claims vis à vis junior claims, we fail to see how the different treatment of the claims in Classes 8 and 9 violates the rule.

The disparate treatment of similar claims may give rise to other arguments outside the absolute priority rule in a cram down, however. Recognizing this, ADECA asserts on appeal that the segregation of its unsecured claim from the claims of other unsecured creditors "discriminate[s] unfairly" against its unsecured claim in violation of the more general cram down provisions found in § 1129(b)(1). Because our narrow holding today only allows for the review of otherwise unpreserved challenges to a cram down plan on the ground that it violates the absolute priority rule found in § 1129(b)(2)(B), we do not address this argument. If the district court agrees that the claims in Class 9 are not junior to ADECA's Class 8 claim, it should not address ADECA's arguments regarding unfair discrimination, as doing so would exceed the scope of our holding.

revest in the Reorganized Debtor, all free and clear of all claims, liens, encumbrances and other interests of creditors."[13]

Lett distributed ballots to impaired creditors for the purpose of seeking acceptance of the Plan in accordance with § 1129(a)(8). ADECA voted to reject the Plan[14] and submitted a written response.[15] Pursuant to § 1128, the bankruptcy court held a confirmation hearing on January 9, 2008. Of particular relevance to this appeal are statements made by the bankruptcy judge and counsel for Lett—and those <u>not</u> made by counsel for ADECA—at this hearing.

The confirmation hearing began with a recitation of the results of the balloting for the Plan. Collins Pettaway, Jr., counsel for Lett, informed the court that although ADECA had voted to reject the Plan, at least one impaired class of creditors had voted to accept the Plan.[16] Thus, the court remarked to Pettaway, "The good news is you have an accepting vote of a class, and that gets you to

---

[13] In an individual Chapter 11 proceeding, the debtor's interests in property of the estate are junior to the interests of all creditors, including unsecured creditors. <u>See, e.g.</u>, <u>In re East</u>, 57 B.R. 14, 17 (Bankr. M.D. La. 1985). The retention of property by such a debtor—including "control or the potential for future earnings"—without full payment to dissenting impaired creditor classes therefore directly implicates the absolute priority rule. <u>Id.</u>; <u>see also</u> <u>infra</u> note 26.

[14] ADECA cast this vote with regard to both its secured and unsecured claims.

[15] While this written response raised several objections, it did not attack the Plan for failing to comply with the absolute priority rule.

[16] The Federal Land Bank Association of South Alabama, an impaired secured creditor whose claim occupied a class by itself, voted to approve the Plan.

11

confirmation, because you have to have one impaired class accepting, which you have." In the same exchange, the court explained, "That means with [Lett] having rejecting classes, we have to proceed under 1129(b) as to those rejecting classes. You have to prove . . . that you meet . . . the 1129(a) standards and the (b) standards as to the rejecting classes, Mr. Pettaway." Later in the proceeding, the court required Pettaway to proffer evidence that the Plan complied with the cram down provisions of Chapter 11, specifically whether the Plan met the requirements of § 1129(b) "as to ADECA and the other non-votes or rejecting votes."

Pettaway obliged, stating that "[Lett] will proffer that the Plan complies with all of the applicable provisions of Section 1129 and, also, he would proffer that all applicable provisions of the title have been met." He further attested that

> the Plan that has been proposed . . . has classified all of the claims and [has informed] all of the Creditors and Classes . . . appropriately; and that the Plan is filed pursuant to and in consideration of the Disclosure Statement; that the Plan is proposed in good faith; that it is his best effort; and that the reason he filed for relief under Chapter 11 was because he had what had amounted to a $3.2 million with interest judgment that ADECA had on him that he did not have enough assets to cover, so he sought relief from the Court.

The court interrupted Pettaway in the midst of his proffer to presciently add, "And by the way, hearing no objection." Counsel for ADECA, present at the hearing, remained silent.

12

Pettaway continued:

> And that [Lett] would also proffer that as it relates to all Creditors that may not have voted or may not have accepted the Plan, that the Plan is fair and equitable to all classes, and that there is no unfair discrimination to either of them to meet the requirements of Section 1129(b).

Following Pettaway's proffer, Lett testified under oath that "everything Mr. Pettaway said" was correct.

James Turnipseed, counsel for ADECA, was then given the floor for argument. He presented a number of objections to the Plan, none of which we take up on appeal.[17] Notably, he did not address the Plan's compliance or noncompliance with the absolute priority rule.

In light of this confirmation hearing, the bankruptcy court approved the Plan, entering a two-page confirmation order on January 14, 2008. In that order, the court noted that "Dr. Lett, through a proffer, testified that the plan met all of the requirements of 11 U.S.C. § 1129(a) and (b)," and stated that it "concludes and finds that the objections of ADECA are due to be overruled and the plan meets th[e] necessary requirements of § 1129."

---

[17] ADECA most forcefully argued the issue of nondischargeability, which was the subject of a separate appeal to this court. See Ala. Dep't of Econ. and Cmty. Affairs v. Lett, 368 F. App'x 975 (11th Cir. 2010).

13

On February 12, 2008, the bankruptcy court issued a "Memorandum Opinion and Amended Order Confirming Debtors Plan of Reorganization." The court announced that "in considering the Plan [the court] found that the Plan complied with all necessary requirements under all applicable provisions, to wit: . . . the debtor . . . met the absolute priority requirements embodied in § 1129(b)(2)."

ADECA appealed the amended order of confirmation to the United States District Court for the Southern District of Alabama, but did not seek a stay of the payments scheduled under the Plan.

B.

On appeal to the district court, ADECA argued, <u>inter alia</u>, that the Plan violated the absolute priority rule set forth in § 1129(b)(2) of Chapter 11.[18] In

---

[18] Specifically, ADECA argued in the district court that

[i]n this case, the Debtor's Plan violates the absolute priority rule on two counts: one, there is a class junior to ADECA's unsecured claim in Class 8, the Class 9 general unsecured creditors, who are receiving property under the Plan, when ADECA's general unsecured claim is not being [paid] in full. . . .

Secondly, the Debtor himself has interests that are subordinate to all creditors. . . . Under the Debtor's Plan, Lett is receiving property . . . . [T]he Debtor's retention of property interests, when all unsecured creditors are not being paid in full, clearly and undisputedly violates the absolute priority rule.

14

response, intervenor Ball and Debtor Lett contended that the appeal was equitably moot or, alternatively, that the Plan had been properly confirmed.

The district court first addressed the mootness issue. It concluded that, although ADECA had failed to obtain a stay of the confirmation order pending appeal, the intervenor failed to sufficiently demonstrate that the Plan had been substantially consummated. As such, the appeal was not equitably moot.[19]

The court then turned to ADECA's absolute priority rule argument. Rather than address the merits, the court found that ADECA had not preserved the issue for review because it did not raise the issue in the bankruptcy court. Elaborating, the district court stated:

> The Eleventh Circuit permits consideration of a pure question of law not raised below if the failure to consider that issue on appeal would result in a miscarriage of justice. "A 'miscarriage of justice' is a '[d]ecision or outcome of [a] legal proceeding that is prejudicial or inconsistent with [the] substantial rights of [a] party.'" [Wright v. Hanna Steel Corp., 270 F.3d 1336, 1342 n.8 (11th Cir. 2001)] (quoting Black's Law Dictionary, 999 (6th ed. 1990)). ADECA argues that this Court should address the absolute priority rule despite its failure to preserve the issue below, but ADECA relies on In re Perez, 30 F.3d 1209 (9th Cir. 1994), a case in which the Ninth Circuit held that the absolute priority rule is a legal issue that may be considered for the first time on appeal. ADECA does not, however, address the Eleventh Circuit's additional requirement for considering issues not preserved for appeal, i.e., that failure to consider the issue will result in a miscarriage of justice. Specifically, there is no

---

[19] We undertake a similar mootness analysis below. See infra part II.A.

15

evidence that the substantial rights of ADECA will be violated or that ADECA will suffer prejudice if the issues on appeal are not addressed. It took four proposed plans and almost as many years for the Bankruptcy Court to approve a plan of reorganization in this case. Whether another attempt to reorganize the debtor in Chapter 11 would meet with success, and put ADECA in a better position, is a matter of speculation.

(emphasis added).

Accordingly, the district court affirmed the decision of the bankruptcy court without addressing whether the Plan complied with § 1129(b) or the absolute priority rule. This appeal followed.

## II.

We review conclusions of law made by either the district court or the bankruptcy court de novo. We will not disturb the bankruptcy court's factual determinations unless they are clearly erroneous; the district court is not authorized to make independent factual findings. In re Club Assocs., 956 F.2d 1065, 1069 (11th Cir. 1992) (citing In re Sublett, 895 F.2d 1381, 1383–84 (11th Cir. 1990)). With these standards of review in mind, we turn to the district court's conclusions of law that ADECA's appeal was not moot but nonetheless barred by the civil plain error rule.

## A.

16

Debtor Lett and intervernor Ball first contend that this appeal is equitably moot because the Plan has already been "so substantially consummated that effective relief is no longer available." Id. at 1069 (quoting Miami Ctr. Ltd. P'ship v. Bank of N.Y., 820 F.2d 376, 379 (11th Cir. 1987)). "Substantial consummation" is defined as

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
> (C) commencement of distribution under the plan.

§ 1101(2). We must consider these factors, but "[e]ven if substantial consummation has occurred, a court must still consider all the circumstances of the case to decide whether it can grant effective relief." In re Club Assocs., 956 F.2d at 1069.[20] In considering these circumstances, we must "strik[e] the proper

---

[20] The Eleventh Circuit in In re Club Associates offered a list of "subsidiary questions" a court may consider when looking at the "circumstances of the case":

> Has a stay pending appeal been obtained? If not, then why not? Has the plan been substantially consummated? If so, what kind of transactions have been consummated? What type of relief does the appellant seek on appeal? What effect would granting relief have on the interests of third parties not before the court? And, would relief affect the re-emergence of the debtor as a revitalized entity? The answers to these questions provide the reviewing court with the backdrop to evaluate the ultimate issue of whether a confirmation plan has progressed to the point where effective judicial relief is no longer a viable option.

956 F.2d 1065, 1069 n.11 (11th Cir. 1992).

balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him." Id. (citing In re Info. Dialogues, Inc., 662 F.2d 475, 477 (8th Cir. 1981)). The party asserting mootness bears the burden of persuasion. In re Anderson, 349 B.R. 448, 454 (E.D. Va. 2006) (footnote omitted).

We find that, despite ADECA's failure to obtain a stay pending appeal and despite the fact that payments have been made under the Plan, Debtor has not "substantially consummated its reorganization plan to the extent that it [has] become[] legally and practically impossible to unwind that which has already been done." In re Condec, Inc., 225 B.R. 800, 803 (M.D. Fla. 1998) (citations omitted).

Ultimately, while we share Debtor's concerns about the impact of invalidating the Plan on other creditors' expectations, we believe that the substantive issues in this case may be resolved without prejudicing the rights of absent third parties.[21] As such, we hold that Lett and Ball have not met their burden of demonstrating that this appeal is equitably moot.

---

[21] Lett and Ball especially fear that they will be required to disgorge payments already made according to the Plan in the event that the Plan is found to violate the absolute priority rule, prejudicing absent third parties. We believe that a finding that the Plan runs afoul of Chapter 11 will not necessarily lead to such prejudice, as the Plan could be restructured to comport with the Bankruptcy Code without requiring wholesale disgorgement. Of course, we trust the wisdom of the bankruptcy court in supervising such a delicate endeavor.

Put simply, Creditor does not wish to return to the drawing board with regard to the entire Plan: "ADECA does not seek to undo or have Lett recoup payments made to secured creditors . . . , who were basically receiving their current loan payments throughout this lengthy Chapter 11 proceeding, and, essentially, continued to receive their regular monthly payments under Lett's proposed Plan of Reorganization." Reply Br. Appellant 4–5. ADECA has no interest in upsetting the expectations of senior secured creditors currently receiving payments under the Plan, as its absolute priority rule arguments focus on the treatment of unsecured creditors and the disposition of property to Lett. Further, ADECA is still years from receiving its first payment under the Plan for either its secured or unsecured claims. Equitable considerations, therefore, do not require us to deem this controversy moot.

B.

We therefore must consider whether the civil plain error rule precludes review of the Plan's compliance with the absolute priority rule. Before addressing this issue, we begin with a review of general appellate principles regarding the preservation of issues for review. We note at the outset our reluctance to intrude upon the province of the bankruptcy courts below by reaching issues not brought

19

before them, as "[b]ankruptcy cases are to be tried in bankruptcy court." In re Air

Conditioning, Inc. of Stuart, 845 F.2d 293, 298 (11th Cir. 1988).

1.

"Ordinarily an appellate court does not give consideration to issues not

raised below." Hormel v. Helvering, 312 U.S. 552, 556, 61 S. Ct. 719, 721, 85 L.

Ed. 1037 (1941). Notions of procedural fairness, finality, and institutional

competence inform this prudential doctrine. As Justice Black explained:

> [O]ur procedural scheme contemplates that parties shall come to issue
> in the trial forum vested with authority to determine questions of fact.
> This is essential in order that parties may have the opportunity to
> offer all the evidence they believe relevant to the issues which the
> trial tribunal is alone competent to decide; it is equally essential in
> order that litigants may not be surprised on appeal by final decision
> there of issues upon which they have had no opportunity to introduce
> evidence.

Id. Nonetheless, this principle is not unyielding; "[t]here may always be

exceptional cases or particular circumstances which will prompt a reviewing or

appellate court, where injustice might otherwise result, to consider questions of

law which were neither pressed nor passed upon by the court . . . below." Id. at

557, 61 S. Ct. at 721 (citing Blair v. Oesterlein Mach. Co., 275 U.S. 220, 225, 48

S. Ct. 87, 88, 72 L. Ed. 249 (1927)). In short, this court should "recogniz[e] the

desirability and existence of a general practice under which appellate courts

20

confine themselves to the issues raised below," but "nevertheless [should] not lose sight of the fact that such appellate practice should not be applied where the obvious result would be a plain miscarriage of justice." Id. at 558, 61 S. Ct. at 722. "This [is a] civil version of the plain error rule." In re Monetary Group, 91 B.R. 138, 141 (M.D. Fla. 1988).

The Eleventh Circuit has embraced this conception of the civil plain error rule.[22] See, e.g., Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc., 689 F.2d 982, 990 (11th Cir. 1982) ("Specifically, we will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to

_____

[22] In Princeton Homes, Inc. v. Virone, a panel of this court outlined five scenarios in which an appellate court may ignore the failure of a litigant to preserve an issue for appeal:

> First, an appellate court will consider an issue not raised in the district court if it involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice. Second, the rule may be relaxed where the appellant raises an objection to an order which he had no opportunity to raise at the district court level. Third, the rule does not bar consideration by the appellate court in the first instance where the interest of substantial justice is at stake. Fourth, a federal appellate court is justified in resolving an issue not passed on below . . . where the proper resolution is beyond any doubt. Finally, it may be appropriate to consider an issue first raised on appeal if that issue presents significant questions of general impact or of great public concern.

612 F.3d 1324, 1329 n.2 (11th Cir. 2010) (quoting Dean Witter Reynolds, Inc. v. Fernandez, 741 F.2d 355, 360–61 (11th Cir. 1984)).

21

consider it would result in a miscarriage of justice." (citing <u>Martinez v. Mathews</u>, 544 F.2d 1233, 1237 (5th Cir. 1976))).[23]

As discussed in part I.B, <u>supra</u>, the district court relied on this precedent to dismiss the case without addressing the merits of ADECA's arguments based on the absolute priority rule. In applying the civil plain error rule, the court explicitly found that no miscarriage of justice would result from its declining to hear such arguments.

We disagree with the district court. We do so, however, not because a miscarriage of justice will result from a refusal to hear ADECA's substantive challenges. Rather, we find that the application of the absolute priority rule in a Chapter 11 cram down proceeding sufficiently places the matter before the bankruptcy court so as to preserve the issue for appeal. An impaired creditor in a dissenting class need not formally object on such ground in the bankruptcy court in order to appeal an improperly confirmed cram down plan.

To give further context to this holding, we examine the absolute priority rule in part II.B.2, and turn to the interaction of the rule and the civil plain error rule in part II.B.3. We believe that allowing for such appellate review in this

---

[23] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

narrow scenario promotes fairness in contentious cram down proceedings without unduly limiting the logical thrust of the civil plain error rule.

2.

Understanding the operation of the absolute priority rule requires a brief overview of confirmation proceedings in a Chapter 11 cram down. Generally, § 1129 describes the requirements that a court must ensure are met before approving any proposed Chapter 11 plan of reorganization. Section 1129(a) prescribes that "[t]he court shall confirm a plan only if" it meets an enumerated set of requirements. Of special interest to our analysis are §§ 1129(a)(8) and 1129(b)(1). Section 1129(a)(8) requires that "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." In our case, it is undisputed that ADECA's secured and unsecured claims are impaired and that ADECA has rejected the Plan with regard to Classes 7 and 8.[24]

Section 1129(b)(1) contemplates such rejection by an impaired class. It reads, in relevant part:

---

[24] As discussed in part I.A, supra, at least one impaired class of claims voted to accept the Plan, thus satisfying the requirement of § 1129(a)(10) that "at least one class of claims that is impaired under the plan has accepted the plan . . ." before it may be confirmed by the court.

if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

§ 1129(b)(1).

In bankruptcy parlance, this is a "cram down," as the court is given the authority to "cram" the opposed plan down upon a creditor in a nonconsenting class. Section 1129(b)(2) defines the specific criteria a plan must conform to in order to be deemed "fair and equitable."[25] These additional measures protect dissenting impaired classes, as a debtor cannot isolate claims for unfair treatment or put the interests of equity holders ahead of the interests of creditors.

As a sister circuit has explained, "[t]he phrase 'fair and equitable' is not a vague exhortation to bankruptcy judges that they do the right thing; rather, it implements the so-called absolute priority rule under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all."

---

[25] For impaired secured claims in cram down, the Code requires in part that the plan provide "that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims. . . ." § 1129(b)(2)(A). For impaired unsecured claims in cram down, the plan must provide that the holder of the claim be paid in full or that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." § 1129(b)(2)(B).

In re Perez, 30 F.3d 1209, 1212–13 (9th Cir. 1994). Section 1129(b) does not create a list of potential arguments or affirmative defenses for the holders of claims in aggrieved classes; rather, it sets out strict requirements that a court must ensure are met before a proposed plan may be confirmed.

Importantly, the Bankruptcy Code envisions a bankruptcy court exercising an independent duty to ensure that the strictures of § 1129(b) are met with regard to impaired dissenting classes of creditors in a Chapter 11 cram down. See In re Piper Aircraft Corp., 244 F.3d 1289, 1299–1300 n.4 (11th Cir. 2001) ("A court must independently satisfy itself that these criteria [in § 1129] are met. Thus, it must consider facts relating to these criteria even in the absence of an objection."); see also In re Baugh, 73 B.R. 414, 416 (Bankr. E.D. Ark. 1987) ("In addition to considering the objections raised by creditors, the Court has an independent duty to determine whether the plan has met all the requirements necessary for confirmation." (citations omitted)).

The record plainly shows that the bankruptcy court fully understood this independent obligation and addressed the absolute priority rule in confirming the Plan despite ADECA's failure to object. Indeed, the court specifically required Debtor to proffer evidence that the Plan conformed to the absolute priority rule. As discussed in part I.A, supra, the bankruptcy administrator objected sua sponte

25

to two separate reorganization plans due to their violations of the rule. Even if the court ultimately erred as a matter of law on the merits, it cannot be said that it did not <u>reach</u> the merits or that the court did not contemplate its duties under § 1129(b).

3.

We finally must decide whether the civil plain error rule should apply to foreclose an appellate argument from an impaired creditor in a dissenting class that a crammed down Chapter 11 plan violates the absolute priority rule. We believe that it should not, as the cram down provisions of the Bankruptcy Code serve to render the civil plain error rule inapplicable to such challenges.

As one district court ruling on a bankruptcy appeal explained,

> [i]t is within this Court's discretion to resolve an issue not decided in the Bankruptcy Court if the record thoroughly presents the issue. In contrast, if the record reflects an issue was presented in a cursory manner and never properly presented to the Bankruptcy Court, the issue is not preserved for appeal. In other words, it is not enough that the record provides facts which may permit the resolution of an issue; rather the record must be adequately developed, to the point that the Bankruptcy Court could have passed on the issue, even though that court declined to do so.

<u>In re Monetary Group</u>, 91 B.R. at 140 (citations omitted). Here, the bankruptcy court sufficiently considered the absolute priority rule issue that ADECA challenges on appeal. The record is "adequately developed"; the bankruptcy court

26

required Lett's counsel to proffer evidence going directly to the heart of the matter. Also, the bankruptcy administrator's rulings indicate that the court was fully cognizant of its responsibilities stemming from the absolute priority rule in confirming Lett's reorganization. Finally, the bankruptcy court not only "could have passed on the issue" of the absolute priority rule, but it, in fact, reached the merits on this issue in its confirmation order. See infra part I.B. To reiterate, we do not hold that a failure to hear ADECA's argument grounded in the absolute priority rule would lead to a miscarriage of justice; rather, we hold that the requirements of § 1129(b) in a cram down proceeding sufficiently present the absolute priority rule in the bankruptcy court as to preserve the issue for review and obviate the civil plain error rule in this narrow context. In sum, the facts have shown that the absolute priority rule was presented to and considered by the bankruptcy court. The issue is therefore preserved for appeal.

The Ninth Circuit has addressed the civil plain error rule under similar circumstances and has also been unpersuaded that it should apply with full rigor to an absolute priority rule challenge on appeal. The court there focused on the somewhat non-adversarial nature of bankruptcy proceedings:

> [T]his [civil plain error] rule is applied more flexibly in the bankruptcy context to reflect the reality that bankruptcy proceedings are not precisely analogous to normal adversary litigation. The

principal reason we require parties to raise an issue in the trial court is to give that court an opportunity to resolve the matter and, hopefully, avoid error. Also, when matters are first raised in the trial court, it's possible to develop the record as needed to present the issue properly on appeal. In normal adversarial litigation, neither the trial judge nor opposing counsel have the responsibility to raise issues a party fails to raise; if the affected party fails to object, the issue never comes before the court. The matter is different in bankruptcy proceedings where debtors-in-possession and trustees have a responsibility to raise certain issues, and the court itself must pass on those issues, whether or not they're specifically put in dispute.

In re Perez, 30 F.3d at 1213 (footnote omitted). Put succinctly, Debtor placed the absolute priority rule squarely before the court when he proffered compliance with § 1129 and sought confirmation of his Chapter 11 plan in cram down. See id. at 1214. In these narrow circumstances, we believe that the civil plain error rule should not preclude this appeal.

Finally, we note our concern for the treatment of impaired creditors in a dissenting class who do not attend confirmation hearings in a Chapter 11 cram down proceeding. While a creditor that fails to appear may waive many arguments, such a creditor should presume that the bankruptcy court will complete its statutorily mandated duties—and, relatedly, for the appellate courts to hear challenges when the court errs as a matter of law concerning the absolute priority rule.

Our ruling today should not lead to a proliferation of appellate litigation or transfer the bulk of bankruptcy litigation to the district courts. Rather, we fully trust the bankruptcy courts to exercise skillfully their duties and the district courts to dispatch frivolous appeals, particularly given the somewhat mechanical operation of the absolute priority rule. If anything, our holding today should rededicate bankruptcy courts to the faithful execution of their statutory duties and ensure that contentious cram down proceedings occur as envisioned by Congress.

As we have focused on the procedural nuances of this case, we reserve for the district court final judgment on whether the Plan violates the absolute priority rule. We draw renewed attention, however, to ADECA's two main complaints: first, that the Plan calls for the payment of general unsecured claims six months after confirmation, while it schedules payments to ADECA's claims to begin many years after confirmation; and second, that the Plan calls for immediate revesting of all property of the estate in the debtor upon confirmation.[26] We believe that

---

[26] ADECA's second complaint more directly implicates the absolute priority rule and thus warrants greater attention from the district court. See supra notes 12, 13. The debtor's property interests in a Chapter 11 proceeding are subordinate to all creditors' interests. See, e.g., In re Tomlin, 22 B.R. 876, 877 (Bankr. M.D. Ala. 1982). Lett asserts that he may retain property so long as he retains no equity interest in that property under the terms of the Plan. The United States Supreme Court has rejected this view. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207–08, 108 S. Ct. 963, 969, 99 L. Ed. 2d 169 (1988) ("We join with the consensus of authority which has rejected this 'no value' theory. Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property.' Whether the value is 'present or prospective, for dividends or only for purposes of control' a

29

ADECA has the right to have these complaints adjudicated on the merits, and we are certain that these issues will be aptly handled in the court below.

Accordingly, we VACATE the district court's decision and REMAND for further disposition consistent with this opinion.

SO ORDERED.

---

retained equity interest is a property interest to 'which the creditors [are] entitled . . . before the stockholders [can] retain it for any purpose whatever.'" (quoting N. Pac. Ry. Co. v. Boyd, 228 U.S. 482, 508, 33 S. Ct. 554, 561, 57 L. Ed. 931 (1913))).

CARNES, concurring in the judgment:

I join in the Court's judgment only because its decision to dispense with the contemporaneous objection rule in appeals from the bankruptcy court to the district court stems from, and is strictly limited by, the unique nature of the bankruptcy court's duty to inquire into and review the cram down provisions of a Chapter 11 plan for purposes of enforcing the absolute priority rule contained in 8 U.S.C. § 1129(b)(2)(B). Any other defect in a Chapter 11 plan which is not brought to the attention of the bankruptcy court will not be preserved for review in the district court. See Majority Op. at 10 n. 12 ("[O]ur narrow holding today only allows for the review of otherwise unpreserved challenges to a cram down plan on the ground that it violates the absolute priority rule found in § 1129(b)(2)(B)."). It is also worth noting that there was a specific objection in the district court. As a result, today's decision does not, and could not, hold that an absolute priority rule violation could be reviewed by this Court if there had been no objection to the plan on that specific ground in the district court.

Finally, reason requires recognizing that we are vacating the district court's decision not because that court failed to faithfully follow the law, but instead only because it understandably lacked the prescience to predict that this Court would

31

carve out an exception to a well-known rule of law that has nearly universal

application.